NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**PRO-TEAM COIL NAIL ENTERPRISE INC., PT ENTERPRISE INC., PRIMESOURCE BUILDING PRODUCTS, INC., S.T.O. INDUSTRIES, INC.,**
*Plaintiffs*

**UNICATCH INDUSTRIAL CO., LTD., TC INTERNATIONAL, INC., HOR LIANG INDUSTRIAL CORPORATION, ROMP COIL NAILS INDUSTRIES INC.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,**
*Defendants-Appellees*

---

2022-2241

---

Appeal from the United States Court of International Trade in Nos. 1:18-cv-00027-MAB, 1:18-cv-00028-MAB, 1:18-cv-00029-MAB, 1:18-cv-00030-MAB, Chief Judge Mark A. Barnett.

---

Decided: August 15, 2024

---

NED H. MARSHAK, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, argued for plaintiffs-appellants. Also represented by MAX F. SCHUTZMAN; DHARMENDRA NARAIN CHOUDHARY, KAVITA MOHAN, ANDREW THOMAS SCHUTZ, EVE Q. WANG, Washington, DC.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY; VANIA WANG, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, argued for defendant-appellee Mid Continent Steel & Wire, Inc. Also represented by BENJAMIN JACOB BAY, JENNIFER MICHELE SMITH-VELUZ.

––––––––––––––

Before LOURIE, DYK, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

Unicatch Industrial Co., Ltd., TC International Inc., Hor Liang Industrial Corp., and Romp Coil Nails Industries Inc. (collectively, "Appellants") appeal the decision of the United States Court of International Trade affirming the United States Department of Commerce's final determination in the first administrative review of its antidumping order on certain steel nails from Taiwan.

Unicatch Industrial Co., Ltd. is a Taiwanese producer of subject merchandise and TC International, Inc. is its affiliated U.S. reseller. These two entities (collectively, "Unicatch") challenge: (1) Commerce's use of total facts otherwise available (FA) with an adverse inference (*i.e.*, total adverse facts available or total AFA) to determine

Unicatch's dumping margin after concluding that Unicatch failed to provide a complete cost reconciliation; and (2) Commerce's selection of the investigation petition rate, 78.17%, as the AFA rate for Unicatch. Hor Liang Industrial Corp. and Romp Coil Nails Industries Inc. (collectively, "HL/Romp") are Taiwanese producers and exporters of subject merchandise that were not selected for individual examination; they received the "all-others" rate of 35.30%, calculated via the expected method. HL/Romp challenge that rate. For the following reasons, we affirm.

BACKGROUND

When merchandise is sold in the United States at less than fair value, Commerce has authority to impose antidumping duties. *Albemarle Corp. v. United States*, 821 F.3d 1345, 1347 (Fed. Cir. 2016) (citing 19 U.S.C. § 1673). Commerce determines "the estimated weighted average dumping margin for each exporter and producer individually investigated" and "the estimated all-others rate for all exporters and producers not individually investigated." *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1322 (Fed. Cir. 2020) (quoting 19 U.S.C. § 1673d(c)(1)(B)(i)). "A dumping margin reflects the amount by which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States)." *Id.* (quoting *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010)).

"At the request of interested parties, Commerce reviews and reassesses its antidumping duty orders annually after the initial investigation." *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 102 (Fed. Cir. 2022) (citing 19 U.S.C. § 1675(a)).

I

In September 2016, Commerce initiated the first administrative review of its July 2015 order imposing

antidumping duties on certain steel nails from Taiwan. The period of review was May 20, 2015, through June 30, 2016. During an administrative review, the "burden of creating an adequate record lies with interested parties and not with Commerce." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019) (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016)). If a respondent fails to provide requested information by the deadline, "Commerce shall fill in the gaps with 'facts otherwise available.'" *Id.* (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003)). If Commerce "determines that an interested party has 'failed to cooperate by not acting to the best of its ability to comply' with a request for information, it may use an adverse inference in selecting a rate from these facts," *i.e.*, the "AFA" rate. *Id.* (quoting *Nippon Steel*, 337 F.3d at 1381).

"Commerce is generally charged with determining individual dumping margins for each known exporter." *Albemarle*, 821 F.3d at 1348 (citing 19 U.S.C. § 1677f–1(c)(1)). But when it is "not practicable" to determine individual margins for each exporter, Commerce may limit its examination to a "reasonable number of exporters" that either constitute a statistically representative sample of all known exporters or account for the largest volume of the subject merchandise from the exporting country. *Id.* (citing 19 U.S.C. § 1677f–1(c)(2)). Commerce's calculation of the "all-others rate" for those not individually investigated is governed by statute:

(A) General rule

. . . [T]he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis

margins, and any margins determined entirely [on the basis of facts available].

(B) Exception

If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely [on the basis of facts available], the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

19 U.S.C. § 1673d(c)(5).  Under the exception above,

[t]he *expected method* in such cases will be to weight average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available. However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporter or producers, Commerce may use other reasonable methods.

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013) (citation omitted) (emphasis added).

Here, Commerce initially selected PT Enterprise Inc. ("PT")—the affiliated exporter of Pro-Team Coil Nail Enterprise, Inc. ("Pro-Team"), another Taiwanese producer of subject merchandise—and Bonuts Hardware Logistics Co., LLC ("Bonuts") as mandatory respondents.  Unicatch asked to be treated as a voluntary respondent and responded to the questionnaire issued to the mandatory respondents.  In February 2017, Commerce selected

Unicatch as an additional mandatory respondent after Bonuts indicated its intent not to participate in the review. As a mandatory respondent, Unicatch "had an individual obligation to cooperate with Commerce's investigation." *Xi'an*, 50 F.4th at 103.

## II

Commerce requested complete cost reconciliations from mandatory respondents to "meaningfully analyze" the respondent's "section D questionnaire cost response and calculate a reliable margin." *Pro-Team Coil Nail Enter., Inc. v. United States*, 419 F. Supp. 3d 1319, 1334 (Ct. Int'l Trade 2019) ("*Pro-Team I*") (citation omitted). In March 2017, after examining Unicatch's response to questionnaire section D, Commerce issued a supplemental questionnaire requesting that Unicatch follow the instructions in the initial questionnaire and "revise its cost reconciliation to reconcile the sales from Unicatch's audited financial statements to the extended total cost of manufacturing in Unicatch's submitted cost database." *Pro-Team Coil Nail Enter., Inc. v. United States*, 483 F. Supp. 3d 1242, 1246 (Ct. Int'l Trade 2020) ("*Pro-Team II*") (citation omitted). Unicatch identified a clerical error in the amount reported for its cost of sales, explained that its initial worksheet reconciled its cost of sales to its total cost of production for subject and non-subject merchandise, resubmitted an exhibit (Exhibit D-16 as Exhibit SD-9A), and provided additional exhibits and information to demonstrate that its reported per-unit costs reconcile to its constructed value costs.

In May 2017, Commerce issued Unicatch a second supplemental questionnaire seeking further clarification regarding Unicatch's cost reconciliation. Commerce directed Unicatch to "revise [its] cost reconciliation in Exhibit SD-9A/Exhibit D-16" to "ensure that it starts with the cost of sales per [Unicatch's] audited financial statements . . . and ends with the total extended TOTCOM

[total cost of manufacturing] as per the submitted cost database," and to "[e]xplain and provide documentary support for each reconciling item." *Pro-Team I*, 419 F. Supp. 3d at 1335 (omission and first alteration in original) (quoting second supplemental questionnaire). Unicatch submitted a revised cost reconciliation worksheet that began with the cost of sales from its financial statements and ended with its review period cost of production for subject and non-subject merchandise. Commerce relied on this information to calculate Unicatch's cost of production for purposes of calculating a preliminary dumping margin.

On June 29, 2017, Commerce issued a third supplemental questionnaire to Unicatch. It consisted of one question relating to January–July 2015 sales by Unicatch to its affiliated U.S. customer TC International.

### III

In August 2017, Commerce published its preliminary results. Commerce used total AFA to assign PT/Pro-Team and Bonuts preliminary weighted-average dumping margins of 78.17%—the dumping margin alleged in the petition underlying the original investigation. Commerce preliminarily calculated a company-specific weighted-average dumping margin of 34.20% for Unicatch and preliminarily assigned Unicatch's calculated rate to HL/Romp.

In Commerce's Final Results published on February 13, 2018, however, Commerce used total AFA to determine the rate for Unicatch as well as PT/Pro-Team and Bonuts. All individually-examined respondents thus received final dumping margins of 78.17%. Consequently, the all-others rate assigned to HL/Romp increased to 78.17% to reflect "the rate determined for all mandatory respondents." *Pro-Team I*, 419 F. Supp. 3d at 1325 (citation omitted). Following the publication of the Final Results, PT, Unicatch, and HL/Romp filed complaints challenging certain aspects of the Final Results.

Between December 2019 and July 2022, the Trade Court remanded this matter back to Commerce three times and issued four decisions.[1]  The Trade Court ultimately sustained:  (1) Commerce's use of PT/Pro-Team's reported data to calculate a company-specific dumping margin of zero percent; (2) Commerce's use of total AFA with respect to Unicatch and its use of 78.17% as the AFA rate, after Commerce corroborated that petition rate by using certain of PT/Pro-Team's transaction-specific margins, and by using a component approach; and (3) Commerce's use of the expected method to calculate the all-others rate, which resulted in a rate of 35.30% for non-selected respondents.  This appeal followed.  We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Trade Court's judgments de novo, reapplying the same standard of review as the Trade Court and thus upholding determinations by Commerce that are supported by substantial evidence and otherwise in accordance with law.  *Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1360 (Fed. Cir. 2022); *Xi'an*, 50 F.4th at 105 (Commerce's "special expertise in administering the antidumping law entitles its decisions to deference" (quoting *Nippon Steel*, 337 F.3d at 1379)).  Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support a conclusion."  *Xi'an*, 50 F.4th at 105

---

[1]    *Pro-Team Coil Nail Enter., Inc. v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ("*Pro-Team I*"); *Pro-Team Coil Nail Enter. v. United States*, 483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) ("*Pro-Team II*"); *Pro-Team Coil Nail Enter., Inc. v. United States*, 532 F. Supp. 3d 1281 (Ct. Int'l Trade 2021) ("*Pro-Team III*"); *Pro-Team Coil Nail Enter., Inc. v. United States*, 587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ("*Pro-Team IV*").

(quoting *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840 (Fed. Cir. 2020)).

Appellants argue that three determinations by Commerce are not supported by substantial evidence: (1) Commerce's finding that Unicatch should be subjected to total AFA; (2) Commerce's finding to apply a 78.17% AFA rate to Unicatch; and (3) Commerce's calculation of a 35.30% rate for HL/Romp. We address each in turn.

I

We first address whether Commerce's use of total AFA with respect to Unicatch is supported by substantial evidence. For the reasons that follow, we conclude that it is.

Unicatch argues that its "actions in this case are not sufficiently egregious to justify Commerce's decision to calculate Unicatch's dumping margin based on [FA] and AFA, let alone total AFA." Appellants' Br. 27. Although Unicatch contends it did not realize there was a problem, it explains that completing the reconciliation as required "would have been a very simple task" and asserts that Commerce should have asked for the reconciliation information in its third supplemental questionnaire and provided "the precise format." Appellants' Br. 30–31.

Commerce can rely on FA when "necessary information is not available on the record" or "an interested party . . . withholds information that has been requested." 19 U.S.C. § 1677e(a); *Xi'an*, 50 F.4th at 108. After determining that it can rely on FA, Commerce can further apply AFA if a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b); *Xi'an*, 50 F.4th at 108. The "best of its ability" standard requires the respondent to "do the maximum it is able to do" to provide Commerce with full and complete answers to all inquiries. *Xi'an*, 50 F.4th at 108; *Nippon Steel*, 337 F.3d at 1382. The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to

cooperate to the best of one's ability, regardless of motivation or intent. *Nippon Steel*, 337 F.3d at 1383.

Commerce's application of total FA and AFA in this case is supported by substantial evidence. First, in deciding to apply FA, Commerce reasonably determined that despite "opportunities to remedy its cost reconciliation with two supplemental questionnaires . . . the information that Unicatch provided [wa]s too incomplete" because there was "no reliable cost of production information." J.A. 17–18. Indeed, Commerce found "significant data discrepancies" when attempting to complete the reconciliation on its own. J.A. 85. Unicatch does not dispute that its cost reconciliation was incomplete. It admits that "several lines of calculations" were "missing." Appellants' Br. 32; Oral Arg. at 4:20–4:29, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-2241_04032024.mp3 ("[Unicatch] did not complete a cost reconciliation in the manner that Commerce was expecting . . . ."); *id.* at 4:52–4:56 ("[Unicatch] didn't give [Commerce] what they wanted.").

Second, in deciding to apply AFA, Commerce found that "Unicatch did not act to the best of its ability to comply with Commerce's requests for information because Unicatch failed to submit a complete cost reconciliation, as requested by Commerce" and thus "Unicatch did not provide Commerce with full and complete answers to Commerce's inquiries." J.A. 20. Substantial evidence thus supports this determination.

Appellants assert that "[i]f Commerce . . . had advised Unicatch that failure to complete the reconciliation would lead to total AFA, Unicatch would have easily rectified the problem." Appellants' Br. 33. But the purpose of 19 U.S.C. § 1677e(b) ("Adverse inferences") is to "provide respondents with an incentive to cooperate." *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). The "best of its ability" standard "*assumes*" importers' familiarity with applicable rules,

regulations, and the "risk of an adverse inference determination." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). We have said that "a reasonable importer should anticipate being called upon" to produce information. *Id.* Even so, contrary to Appellants' position, Commerce *did* provide Unicatch with warnings in its first and second supplemental questionnaires. Commerce explained that if Unicatch failed to submit the requested information (or a written extension request) by the deadline, Commerce may conclude that Unicatch has decided not to cooperate in this proceeding. Failing to submit several missing lines of calculations, which Unicatch "could have easily submitted," Appellants' Br. 32, and instead "instruct[ing] Commerce how to get the completed reconciliation without actually providing it," J.A. 20, cannot be Unicatch's "maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel*, 337 F.3d at 1382. It bears repeating that the burden of creating the record lies with interested parties like Unicatch, not Commerce. *BMW*, 926 F.3d at 1295.

Commerce acknowledged that the investigation petitioner had "attempted to provide a gap-filling alternative adjustment, as opposed to applying AFA" but found that it only led to "more questions regarding the completeness of the reconciliation, the reconciling items, and whether all costs were properly included or excluded." J.A. 18. When Commerce is "confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative, the court will not second-guess Commerce's choice." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1313 (Ct. Int'l Trade 2007); *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1380 (Fed. Cir. 2001) ("[Our] court 'accords deference to the determinations of [Commerce] that turn on complex economic and accounting inquiries,' . . . [such as] determining whether reported costs reconcile to financial statements . . . .").

Because of the importance of the information requested, *see, e.g.*, J.A. 16, it was reasonable for Commerce to expect "more accurate and responsive answers to the questionnaire[s]." *Xi'an*, 50 F.4th at 110 (citation omitted). Unicatch did not provide such answers, and thus we cannot find the application of total AFA unsupported by substantial evidence. *See id.* at 109 (it is reasonable to use total AFA "when a respondent has failed to cooperate to the best of its ability despite a number of opportunities to do so").

## II

We next address Commerce's decision to apply a 78.17% AFA rate to Unicatch. As provided by statute,

> [a]n adverse inference . . . may include reliance on information derived from--
>
> (A) the petition,
>
> (B) a final determination in the investigation under this subtitle,
>
> (C) any previous review under section 1675 of this title or determination under section 1675b of this title, or
>
> (D) any other information placed on the record.

19 U.S.C. § 1677e(b)(2). Information derived from the petition "shall, to the extent practicable, [be] corroborate[d] . . . from independent sources" that are reasonably available. *Id.* § 1677e(c)(1). Corroboration means a determination that the information has "probative value." *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016) (citation omitted). Commerce can corroborate the use of the petition rate in a number of ways, including using individual transaction-specific margins or a component approach.

Here, for purposes of corroboration, Commerce compared the 78.17% petition rate to certain of PT/Pro-Team's

transaction-specific dumping margins, then found that a sufficient number of transaction-specific margins exceeded the petition rate. As asserted by Appellants' counsel during oral argument, "there were two sales that [Commerce] said were corroborating. The two sales were . . . at rates of 189%." Oral Arg. at 7:30–7:42. Commerce "took these two sales" out of "12,541 sales" in Pro-Team's database—i.e., "0.016%." *Id.* at 7:42–7:53. The "value of those two sales was $974 out of $35 million. The quantity was 2,000 kg out of 22 million kg." *Id.* at 7:54–8:08. Appellants argue that the 78.17% petition rate is "not valid" and not properly "corroborated by two absolutely outlying sales from the database." *Id.* at 8:41–9:05.

We find that substantial evidence supports Commerce's application of the 78.17% AFA rate. In applying AFA, Commerce is not required to "estimate what the . . . dumping margin would have been if the interested party . . . had cooperated" or to "demonstrate that the . . . dumping margin used by the administering authority reflects an alleged commercial reality of the interested party." *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1299 (Fed. Cir. 2021) (alterations in original) (quoting 19 U.S.C. § 1677e(d)(3)). We have held that a dumping margin can be corroborated by a single sale with that margin. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002). In our prior cases, we have held that corroboration by "a small portion" of sales—e.g., 0.04% of sales—is sufficient. *Id.*; *see also PAM, S.p.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009) (concluding that an AFA margin was supported by substantial evidence despite the fact that sales with that margin "amounted to only 0.5%" of sales).

Commerce found "nothing on the record" that "indicates that the[ corroborating] transactions were unique in some way" or were conducted outside "the ordinary course of business." *Pro-Team III*, 532 F. Supp. 3d at 1287 (alteration in original) (quoting Final Results of Second

Redetermination Pursuant to Court Remand).  It is not our role to "refind" facts or "interpose" our own determinations. *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 717 (Fed. Cir. 2020) (citation omitted).  Two sales can corroborate the petition rate.  As long as the data is corroborated, "Commerce acts within its discretion when choosing which sources and facts it will rely on to support an adverse inference." *Ta Chen*, 298 F.3d at 1339. And Commerce's "discretion in applying an AFA margin is particularly great when a respondent is uncooperative by failing to provide" requested information.  *PAM, S.p.A.*, 582 F.3d at 1340.

Because we conclude that Commerce adequately corroborated the petition rate using the transaction-specific method, we need not discuss Commerce's component approach to corroboration.

### III

Lastly, we turn to Commerce's calculation of a 35.30% rate for HL/Romp using the expected method.  Appellants argue that "the 35.30% rate does not reasonably reflect HL/Romp's dumping margin." Appellants' Br. 57.

"[W]hen Commerce applies the expected method, the party that desires Commerce to deviate from the expected method bears the burden to identify and present substantial evidence on the record that either the expected method was 'not feasible' or produced results not 'reasonably reflective of potential dumping margins for non-investigated exporters or producers.'" *PrimeSource Bldg. Prods., Inc. v. United States*, No. 22-2128, slip op. at 15 (Fed. Cir. Aug. 7, 2024) (citation omitted).  *PrimeSource* is binding on this panel.

Appellants have not shown that the expected method was unreasonable.  First, contrary to Appellant's suggestions that the 2013 petition data should not have been used, Commerce is permitted to use corroborated data from the petition.  *See* 19 U.S.C. § 1677e(b)(2).  As discussed in

Part II, we find no error in Commerce's calculation of the AFA rate. Second, Appellants have not shown that the 35.30% rate resulting from the expected method is unreasonable based on the data on the record. Commerce limited its examination to exporters or producers accounting for the largest volume of the subject merchandise during the review period (PT/Pro-Team, Unicatch, and Bonuts) "as expressly authorized by 19 U.S.C. § 1677f–1(c)(2)." *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017). "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters," unless the application of those data to non-examined parties is shown to be unreasonable. *Albemarle*, 821 F.3d at 1353. "The statute assumes that, absent [evidence that the largest exporters are not representative], reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." *Changzhou*, 848 F.3d at 1012 (alteration in original) (quoting *Albemarle*, 821 F.3d at 1353).

Commerce found "no indication that the selected mandatory respondents were not representative of the experience of the non-selected companies, even when the rates of the mandatory respondents were based on AFA." J.A. 336. Commerce also reiterated the presence of record "evidence that demonstrates that dumping is occurring above the 35.30 percent rate." *Id.* Accordingly, Commerce's use of the expected method was appropriate.

Appellants repeatedly assert that the "35.30% rate is aberrational compared to margins calculated for cooperative respondents . . . before, during, and immediately after" the first administrative review. Appellants' Br. 57; *see also id.* at 57–59. We need not consider other review periods here because contemporaneous data show that the rates of the period under review, including the AFA rate, were reasonable.

Appellants also argue that "Commerce improperly rejected record evidence that Bonuts was not a representative respondent." Appellants' Br. 61. They make no argument that PT/Pro-Team and Unicatch were not representative. Commerce explained that "although Bonuts . . . requested deselection and claimed to be unrepresentative, [it] continued to treat Bonuts as a mandatory respondent and instead, determined that Bonuts failed to cooperate to the best of its ability." J.A. 339. Commerce, unable to assess the reliability of Bonuts's statements, found that Bonuts's "unsupported assertions" were not sufficient to rebut the "assumed representativeness" of mandatory respondents. J.A. 339–40. We cannot say that was unreasonable.

Appellants' arguments amount to no more than a request for us to reweigh evidence. We decline to do so. Commerce's use of the expected method to calculate the 35.30% all-others rate is supported by substantial evidence.

## CONCLUSION

We have considered Appellants' remaining arguments and find them unpersuasive. For the reasons above, we affirm the United States Department of Commerce's final determination in the first administrative review of its antidumping order on certain steel nails from Taiwan.

## AFFIRMED