**AUTO TELECOM CO., LTD., Biotronic Telecoms Co., Ltd., Taiwan International Standard Electronics, Ltd., and Tecom Co., Ltd., Plaintiffs,**

**v.**

**The UNITED STATES, and U.S. Department of Commerce, Defendants,**

**and**

**American Telephone and Telegraph Co., Defendant–Intervenor.**

**Court No. 90–01–00029.**

United States Court of International Trade.

May 20, 1991.

Ablondi & Foster, P.C., Italo H. Ablondi, F. David Foster, Sturgis M. Sobin, Peter J. Koenig and Robert T. Maguire, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Vanessa P. Sciarra, U.S.

Dept. of Justice, Civ. Div., Tina M. Stikas, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel, for defendants.

Covington & Burling, Harvey M. Applebaum, O. Thomas Johnson, Jr., and Sonya D. Winner, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs challenge the final determination by the Department of Commerce ("Commerce" or "Department") in *Certain Small Business Telephone Systems and Subassemblies Thereof from Taiwan*, 54 Fed.Reg. 42543 (October 17, 1989). Specifically, plaintiffs, Taiwanese manufacturers and exporters of small business telephone systems and subassemblies, contest the determination by Commerce that imports manufactured by those Taiwanese producers in the "all other" category were, or were likely to be sold in the United States at less than fair value ("LTFV").[1] For the following reasons, the court finds the final determination of Commerce to be supported by substantial evidence in the record and otherwise in accordance with law. Plaintiffs' motion for judgment on the agency record is therefore denied and this action is dismissed.

1. Commerce determines whether goods are sold at less than fair value by comparing foreign market value and United States price. In simple terms, the difference is the dumping margin. This becomes the duty deposit rate and, if not altered by an administrative review, it will also become the rate at which antidumping duties are imposed.

2. This action was in response to the filing of a petition by American Telephone & Telegraph Company and Comdial Corporation on December 28, 1988. After receiving a petition, the antidumping law provides that Commerce must determine whether "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673 (1988).

3. In a case where the requirements for application of the special multinational methodology for calculating the foreign market value of merchandise are met, 19 U.S.C. § 1677b(d) (1988) provides that:

> [Commerce] shall determine the foreign market value of such merchandise by reference to

## Background

On January 17, 1989, Commerce initiated an antidumping investigation of small business telephone systems and subassemblies thereof from Taiwan.[2] During the investigation Commerce found that Taiwan Nitsuko, a Taiwan subsidiary of Nitsuko Japan, was the major Taiwan producer of the subject telephone systems and subassemblies which were exported from Taiwan to the United States. Commerce found that Taiwan Nitsuko accounted for more than sixty percent of all imports from Taiwan. Commerce normally investigates at least sixty percent of imports. In this case, Commerce intended to investigate only Taiwan Nitsuko and it attempted to gain adequate information from Taiwan Nitsuko with respect to the special rule for certain multinational corporations. *See* 19 U.S.C. § 1677b(d) (1988) (providing a special methodology for finding foreign market value in the case of certain multinational corporations).[3] Taiwan Nitsuko declined to answer the questionnaire prepared by Commerce, thereby forcing Commerce to make its LTFV determination on the basis of best information available. *See* 19 U.S.C. § 1677e(c) (1988). This resulted in a dumping margin for Taiwan Nitsuko based entirely on sales by its Japanese affiliate.[4]

> the foreign market value at which such or similar merchandise is sold in substantial quantities by one or more facilities outside the country of exportation.

4. In the final determination Commerce described the methodology it utilized as follows:

> [W]e attempted to compare the FMV [foreign market value] in the petition for merchandise produced and sold in Japan with actual United States prices reported by Taiwan Nitsuko for products produced in Taiwan and sold in the United States, or Taiwan Nitsuko's U.S. sales prices as provided in the petition. Since we did not have data on sales of merchandise produced by Taiwan Nitsuko in Taiwan and sold in the United States that was comparable to the merchandise listed in the petition as being produced and sold in Japan and there were no U.S. sales prices for Taiwan Nitsuko reported in the petition, we used the margins calculated in the petition based on a comparison of the FMV of merchandise produced and sold in Japan and the United States price of merchandise produced in Japan and sold in the United States.

One small Taiwanese producer, Sun Moon Star, requested that it be permitted to submit a response to the questionnaire prepared by the Commerce staff for this investigation. Commerce accepted Sun Moon Star's voluntary questionnaire. No other Taiwanese producer sought to submit a questionnaire response at this stage.

On September 6, 1989, Commerce extended the deadline for notification of a party's intent to attend the administrative hearing and to submit arguments so as to allow plaintiffs to express their views. Administrative Record ("R.") at 187. Plaintiffs submitted a brief to Commerce regarding calculation of the "all others" margin and then participated in the administrative hearing that was held on September 20, 1989. R. at 197, 204.

On October 17, 1989, Commerce issued its final determination, finding that imports of small business telephone systems and subassemblies thereof from Taiwan were being, or were likely to be, sold in the United States at less than fair value. 54 Fed.Reg. 42543 (1989). Commerce determined that the margin for Taiwan Nitsuko was 129.73 percent, the margin for Sun Moon Star was found to be zero percent, and the deposit rate for "all other" Taiwanese producers was set at zero percent.[5] Because Commerce concluded that Sun Moon Star was not dumping, Sun Moon Star was excluded from the antidumping duty order. The "all other" producers, however, were subject to the affirmative LTFV determination and, although they were given a zero deposit rate, they are subject to potential administrative reviews which could alter the rate.

### Analysis

■■■ Plaintiffs contend that since Commerce's determination with respect to Sun

Moon Star was negative, the determination for all the other Taiwanese companies should also be negative. In essence, plaintiffs' contention is that the only Taiwanese producer which provided Commerce with any data using prices derived from the Taiwanese production and export activity, Sun Moon Star, received a negative determination, and therefore, this finding should also be applied to "all other" Taiwanese producers.[6]

Commerce addressed this issue in the final determination and recognized that it seemed unfair to base the "all others" margin on that of Taiwan Nitsuko because its margin was founded on sales by its Japanese affiliate. Commerce stated that it found it "more appropriate to apply the margin of SMS [Sun Moon Star], the only responding company from Taiwan, as the 'All Others' rate." 54 Fed.Reg. at 42550. Commerce permitted the remaining Taiwanese producers of the subject merchandise to benefit from the zero margin of Sun Moon Star even though Commerce possessed no information indicating their margins were actually zero. Although Commerce ordinarily would have assigned the rate of 129.73 percent to the "all other" category, see, e.g., Certain Steel Wire Nails from Korea, 47 Fed.Reg. 27392 (1982), a departure in this case was warranted given the circumstances and Commerce's obligation to be fair to everyone affected by its determinations, including non-participants. See Asociacion Colombiana De Exportadores De Flores v. United States, 13 CIT ——, ——, 717 F.Supp. 834, 838 n. 5 (1989) (Non-participants have a right to expect that Commerce's techniques will yield a fair rate related to actual industry behavior.), aff'd, 901 F.2d 1089,

---

54 Fed.Reg. at 42544.

**5.** Commerce stated that
the Department has determined that SBTS [small business telephone systems] from Taiwan are being, or are likely to be, sold in the United States at less than fair value. The only company excluded from this determination is SMS [Sun Moon Star]. Therefore, all companies subject to the "All Others" rate are covered by the Department's affirmative determina-

tion, but will be subject to a cash deposit of 0.00%.
54 Fed.Reg. at 42550.

**6.** The major Taiwanese producer, Taiwan Nitsuko, had no sales of the product in the home market during the period of investigation. R. at 40, 156. As indicated, it provided no data on its sales for export to the United States.

(Fed.Cir.) *cert. denied,* —— U.S. ——, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).[7]

Contrary to plaintiffs' arguments, the court does not find an affirmative determination with a zero percent margin for "all other" producers to be either logically inconsistent or unfair. Plaintiffs confuse two separate and distinct decisions that Commerce must make in every LTFV investigation. First, Commerce must decide whether there is sufficient evidence that merchandise from a country is being, or is likely to be, sold at less than fair value. If there is an affirmative determination of the existence of dumping, then Commerce moves to the second decision, namely, the appropriate cash deposit rate for the subject companies.

In this case, Commerce clearly stated that it had determined that the subject merchandise was being sold at less than fair value in the United States. It so happened that, because of the nature of the Taiwanese small business telephone market, Commerce reached this conclusion by examining the pricing practices of a multinational corporation and also by resorting to best information available. The statute envisions both possibilities.

Plaintiffs do not even attempt to argue that insufficient evidence of dumping existed as to Taiwan Nitsuko. As detailed above, they base their argument on the fact that Taiwan Nitsuko is subject to the multinational corporation methodology, a methodology which uses non-Taiwanese data. There is no real dispute that Commerce correctly analyzed the Taiwanese small business telephone and subassembly market by using best information available as to the major producer of these telephones and subassemblies and, as indicated, Congress has specifically provided special rules for multinational corporations, such as Taiwan Nitsuko, with insufficient sales in the market of the country of exportation. Whether or not the margin was set with reference to sales of a non-Taiwanese company, Taiwan Nitsuko is still a Taiwanese producer. Perhaps what plaintiffs really challenge is Commerce's practice of investigating only such companies as account for sixty percent of total imports, even when only one company produces the entire sixty percent. It may be that a broader investigation would have addressed plaintiffs' concerns. Plaintiffs, however, do not raise that issue here and they did not raise that issue below. Thus, there is no reason to upset the affirmative LTFV determination based on the best information available as to Taiwan Nitsuko.[8]

As the second step in the determination Commerce then addressed the cash deposit rate to be applied to the various producers. It was at this stage of the determination that Commerce declined to make broader use of the margin for the major producer, the multinational corporation, choosing instead to base the margin for all other Taiwanese producers on the margin calculated for the only Taiwanese producer for whom Commerce had received adequate information.[9] As indicated, the court finds this to be fair.

Assuming *arguendo* that plaintiffs were really concerned about the use of a multinational margin in making an affirmative determination for Taiwanese companies, plaintiffs had several avenues available to them which they did not pursue. They could have participated in the administrative process from the outset, attempting to

---

**7.** In this case plaintiffs participated in the administrative proceeding at a late stage, which provided a basis for standing to challenge the determination at issue. They did not participate in the sense of seeking their own margin.

**8.** A determination based on the best information available for a multinational corporation is not unprecedented. In *Certain Steel Wire Nails from Korea, supra,* Commerce relied on the multinational corporation provision and was compelled to use best information available in reaching its affirmative determination.

**9.** The court notes that at the preliminary determination Commerce had established an "all others" deposit rate of 129.73% based on its normal practice of including best information available margins but excluding zero percent margins. Ultimately, after several Taiwanese producers objected to this deposit rate, Commerce applied Sun Moon Star's zero percent margin in the final determination, even though Sun Moon Star accounted for a very small percentage of total production.

obtain some overall methodology which would address their problem. Whether they would have been successful is a question which the court cannot answer. Plaintiffs might also have requested permission to submit their own data in the hopes of obtaining a zero rate and exclusion from the dumping order.[10] Whether they would have been successful in achieving exclusion is also an unanswerable question.

It should be remembered that in actuality there is no direct evidence that plaintiffs' margins, if calculated, would be zero, as was Sun Moon Star's. While Commerce presumed these producers would have lower margins than Taiwan Nitsuko had and that such margins were apt to be more like Sun Moon Star's, there is no specific data to support that conclusion. While the court finds the presumption a fair one to make under these facts and at the deposit-setting stage, Commerce might have fairly chosen some other rate for the "all other" producers.[11]

Commerce did not act unreasonably or unfairly in making an affirmative determination applicable to plaintiffs. Given the record developed in the administrative proceedings, it had no discretion to do anything else. Accordingly, plaintiffs' motion for judgment on the agency record is dismissed.

---

**10.** None of the plaintiffs requested exclusion from the antidumping order under 19 C.F.R. § 353.14 (1990). Exclusion from an antidumping order would have relieved the plaintiffs of the burden of an administrative review under 19 U.S.C. § 1675 (1988) and the risk of imposition of a duty rate other than zero, as the result of such review. Whether their resources were so limited or the investigation was so unwieldy that this was not practical are not facts of record here. For a contrasting situation, *see* *Asociacion Colombiana De Exportadores De Flores, supra.*

**11.** The court does not mean to imply that the margin of Taiwan Nitsuko could have been utilized fairly. This issue is not before the court.