# United States Court of Appeals for the Federal Circuit

---

**CHANGZHOU HAWD FLOORING CO., LTD., DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD., DUNHUA CITY DEXIN WOOD INDUSTRY CO., LTD., DALIAN HUILONG WOODEN PRODUCTS CO., LTD., KUNSHAN YINGYI-NATURE WOOD INDUSTRY CO., LTD., KARLY WOOD PRODUCT LIMITED, FINE FURNITURE (SHANGHAI) LIMITED, LUMBER LIQUIDATORS SERVICES, LLC, ARMSTRONG WOOD PRODUCTS (KUNSHAN) CO., LTD.,**
*Plaintiffs-Appellants*

**HOME LEGEND, LLC,**
*Plaintiff*

**v.**

**UNITED STATES, THE COALITION FOR AMERICAN HARDWOOD PARITY,**
*Defendants-Appellees*

---

2015-1899, 2015-1901, 2015-1903, 2015-1904

---

Appeals from the United States Court of International Trade in No. 1:12-cv-00020-DCP, Judge Donald C. Pogue.

---

Decided: February 15, 2017

---

JEFFREY S. GRIMSON, Mowry & Grimson, PLLC, Washington, DC, argued for all plaintiffs-appellants. Plaintiff-appellant Fine Furniture (Shanghai) Limited also represented by KRISTIN HEIM MOWRY, JILL A. CRAMER, SARAH M. WYSS.

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, for plaintiffs-appellants Changzhou Hawd Flooring Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Dunhua City Dexin Wood Industry Co., Ltd., Dalian Huilong Wooden Products Co., Ltd., Kunshan Yingyi-Nature Wood Industry Co., Ltd., Karly Wood Product Limited. Also represented by JAMES KEVIN HORGAN, ALEXANDRA H. SALZMAN.

ARTHUR K. PURCELL, Sandler Travis & Rosenberg, P.A., New York, NY, for plaintiff-appellant Lumber Liquidators Services, LLC. Also represented by MARK LUDWIKOWSKI, KRISTEN SMITH, Washington, DC; MICHELLE L. MEJIA, Chicago, IL.

HAROLD DEEN KAPLAN, Hogan Lovells US LLP, Washington, DC, for plaintiff-appellant Armstrong Wood Products (Kunshan) Co., Ltd. Also represented by CRAIG ANDERSON LEWIS.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, CLAUDIA BURKE; SHELBY ANDERSON, Office of Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

JEFFREY STEVEN LEVIN, Levin Trade Law PC, Bethesda, MD, for defendant-appellee The Coalition for American Hardwood Parity.

————————————

Before LOURIE, TARANTO, and CHEN, *Circuit Judges*.

TARANTO, *Circuit Judge*.

This case arises from the U.S. Department of Commerce's antidumping-duty investigation of multilayered wood flooring imports from the People's Republic of China. The appellants here are Chinese entities that Commerce found had demonstrated their independence from the Chinese government and so deserved a "separate" antidumping-duty rate, not the so-called China-wide rate that applies to entities that had not shown their independence from the Chinese government. Commerce did not individually investigate appellants to determine firm-specific dumping margins. Instead, it assigned them a rate that, though not specified numerically, was declared to be more than *de minimis*, even though it found zero or *de minimis* dumping margins for all three of the Chinese firms that it had individually investigated. The Court of International Trade affirmed that determination.

Appellants contend that they are entitled to a *de minimis* rate. After the Court of International Trade rendered its decision in this case, our court made clear that the "separate rate" method used by Commerce here is a departure from the congressionally approved "expected method" applicable when all of the individually investigated firms have a zero or *de minimis* rate, which is the case here, and that certain findings are necessary to justify such a departure. *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1348 (Fed. Cir. 2016). Under the "expected method," appellants would be entitled to a *de minimis* rate. Because Commerce did not make the findings needed to justify departing from the expected method, we vacate the Court of International Trade's judgment, and we remand.

I

In 2010, the Department of Commerce initiated an antidumping-duty investigation of multilayered wood flooring from China, based on a petition filed by the Coalition for American Hardwood Parity under 19 U.S.C. § 1673a(b). Multilayered Wood Flooring from the People's Republic of China: Initiation of Antidumping Duty Investigation, 75 Fed. Reg. 70,714 (Dep't of Commerce Nov. 18, 2010). In order to select particular Chinese firms to be individually investigated as mandatory respondents, Commerce sent questionnaires to the Chinese exporters and producers identified in the petition, asking about the quantities and value of the goods at issue sent to the United States. *Id.* at 70,717–18. Of the 190 recipients of the questionnaire, 80 timely responded. Multilayered Wood Flooring from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, 76 Fed. Reg. 30,656, 30,657 (Dep't of Commerce May 26, 2011). Commerce selected "the three largest exporters (by volume)" as mandatory respondents. *Id.* at 30,658. Although several firms offered to be individually investigated as voluntary respondents, *id.*, the three mandatory respondents are the only firms that Commerce individually investigated in this investigation. *See Changzhou Hawd Flooring Co. v. United States*, 44 F. Supp. 3d 1376, 1389 n.31, 1390 (Ct. Int'l Trade 2015).

Commerce deems China to be a nonmarket economy, and it presumes that each Chinese exporter and producer is state-controlled, and thus covered by a single China-wide antidumping-duty rate, but a firm may rebut the presumption. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1370 (Fed. Cir. 2012). Here, Commerce determined that 74 firms established their independence from the Chinese government. *See* Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 76 Fed. Reg. 64,318, 64,321–22 (Dep't of Commerce

Oct. 18, 2011). For those 74 firms—not individually investigated, but not covered by the China-wide rate—Commerce had to calculate a "separate rate."

Commerce published its Final Determination on October 18, 2011, finding that the subject merchandise was being sold at less than fair value (dumped) in the United States. *Id.* at 64,318. Commerce determined that one of the three mandatory respondents had a *de minimis* dumping margin, but it assigned margins of 3.98% and 2.63% to the other two mandatory respondents. *See id.* at 64,323. After a voluntary remand from the Court of International Trade, Commerce revised the mandatory respondents' dumping margins, finding all three to be zero or *de minimis*. J.A. 101941. Commerce calculated the "separate rate," not by simply using the zero/*de minimis* rates for the three mandatory respondents, but by averaging those three zero figures with the 25.62% rate it adopted as the China-wide rate—yielding a separate rate of 6.41%. J.A. 101942.

On review, the Court of International Trade affirmed the dumping margins for the mandatory respondents but remanded for further explanation of how the separate rate related to economic reality. *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1336 (Ct. Int'l Trade 2014). On remand, Commerce reasoned that the separate rate for the period of investigation should not be drawn *entirely* from the three mandatory respondents, all having a *de minimis* rate. Commerce gave two reasons. First, Commerce said, "if [any of] the 110 companies [that did not respond to the quantity-and-value questionnaires] had chosen to cooperate, the examined company's rate would have been above *de minimis* . . . and would have been assigned to the separate rate plaintiffs as a separate rate in the *Final*

*Determination.*" J.A. 102099.[1] Second, merely as confirmation, Commerce pointed to the recent results of its first administrative review under 19 U.S.C. § 1675, in which Commerce found dumping even for imports made after the announcement of the antidumping-duty order, notwithstanding that "the discipline of an antidumping order often results in lower or no margins . . . as companies may change their pricing practices to eliminate the price discrimination found in the period of investigation." J.A. 102100. That result, Commerce said, confirmed the likelihood that it would have found above-*de minimis* dumping had it investigated more individual firms during the investigation. *Id.* On that basis, although Commerce did not reaffirm its 6.41% rate for the "separate rate" (not individually investigated) Chinese entities, it declared that they would be subject to a rate that it did not specify but declared to be more than *de minimis*.[2]

Appellants challenged that determination in the Court of International Trade. That court affirmed, con-

---

[1]    Of the 110 entities that did not respond to the quantity-and-value questionnaires, Commerce removed one, located in Taiwan, from the investigation. J.A. 101424.

[2]    Commerce also determined that it need not calculate a specific separate rate for all but one of the separate-rate litigants (appellant Changzhou Hawd Flooring Company) because "the rate determined in the first administrative review supersedes the cash deposit rate established in the final determination of the investigation." J.A. 102100. As to Changzhou Hawd Flooring, Commerce announced that it would conduct an individual investigation, J.A. 102102, but it decided to delay the actual investigation until after the Court of International Trade reviewed the remand determination. *See Changzhou Hawd Flooring*, 44 F. Supp. 3d at 1382 & n.13.

cluding that "Commerce's determination regarding the group . . . is based on a reasonable reading of the law and record evidence." *Changzhou Hawd Flooring*, 44 F. Supp. 3d at 1380. The court held that Commerce's methodology was permissible because the statute allows "any reasonable method." *Id.* at 1384. After one further remand, which brought Changzhou Hawd Flooring within the "separate rate" applicable to government-independent but not individually investigated firms, the Court of International Trade entered a final judgment. *Changzhou Hawd Flooring Co. v. United States*, 77 F. Supp. 3d 1351, 1359–60 (Ct. Int'l Trade 2015).[3]

Appellants, who are separate-rate entities, have timely appealed the above-*de minimis* separate rate, arguing for a *de minimis* separate rate. They assert that, although no rate was numerically specified, the assignment of an above-*de minimis* rate harms them because it subjects them to the antidumping-duty order and its continuing consequences, including subsequent periodic reviews under 19 U.S.C. § 1675, whereas assigning them a *de minimis* rate in this investigation would remove them from the order and relieve them from its consequences. *See* 19 C.F.R. § 351.204(e)(1) (excluding from final determination "any exporter or producer for which the Secre-

---

[3] In *Changzhou Hawd Flooring*, 44 F. Supp. 3d at 1390, the court held to be arbitrary and capricious Commerce's decision to conduct a full individual investigation of Changzhou Hawd Flooring so late in the investigation. On remand, Commerce applied the same above-*de minimis* but unspecified separate rate to Changzhou Hawd Flooring that it applied to the other separate-rate firms. The Court of International Trade approved that decision. *Changzhou Hawd Flooring*, 77 F. Supp. 3d at 1359. Commerce does not challenge the rejection of its attempt to individually investigate Changzhou Hawd Flooring.

tary determines an individual weighted-average dumping margin . . . rate of zero or *de minimis*"); *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1216 (Fed. Cir. 2005); *Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1375 n.3 (Fed. Cir. 2004); *see also* 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4) (disregarding weighted dumping margin that is *de minimis*). Commerce does not disagree that appellants have a stake in challenging the above-*de minimis* rate. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

"Commerce's determination will be sustained unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1377 (Fed. Cir. 2013); 19 U.S.C. § 1516a(b)(1)(B)(i). Appellants argue that Commerce erred by not relying on the three mandatory respondents' zero/*de minimis* rates to generate a *de minimis* "separate rate." We agree that Commerce has not justified its departure from that method.

In investigations involving exporters from market economies, 19 U.S.C. § 1673d(c)(5) establishes the method for determining the rate for entities that are not individually investigated, the so-called all-others rate. Commerce has relied on that statutory provision in determining the separate rate for exporters and producers from nonmarket economies that demonstrate their independence from the government but that are not individually investigated. *See Albemarle*, 821 F.3d at 1348.

The statute says that where the "estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or *de minimis* margins, or are determined entirely under [19 U.S.C. § 1677e]," Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated,

including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B). But the Statement of Administrative Action accompanying the Uruguay Round Agreements Act—which Congress has deemed "authoritative," 19 U.S.C. § 3512(d)—states that the "expected method" is to "weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 (quoted in *Albemarle*, 821 F.3d at 1352 & n.5).[4] If Commerce reasonably concludes that "this method is not feasible" or would result "in an average that would not be reasonably reflective of poten-

---

[4] The language of "margins determined pursuant to the facts available" refers to margins determined under 19 U.S.C. § 1677e. The statutory context, 19 U.S.C. § 1673d(c)(5)(B), makes clear that the language refers to margins so determined for firms that are individually investigated. Commerce has not suggested that, in the present case, there are any such § 1677e-based margins to be included in the average. Thus, only "zero and *de minimis* margins" are part of the average here.

In this respect, the case is unlike *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013), where Commerce calculated a "separate rate" by averaging the two individually investigated firms' rates—one *de minimis*, the other a high § 1677e-based rate. This court held Commerce's result to be unreasonably high on the record in the particular case. *Id.* at 1377–81. Here, in contrast, there is no issue of an unreasonably high average of the individually investigated firms' rates; as in *Albemarle*, 821 F.3d at 1349, the average in this case is zero or *de minimis*.

tial dumping margins for non-investigated exporters or producers," it "may use other reasonable methods." *Id.*

*Albemarle* explains that Congress thus expressed a preference for the expected method, 821 F.3d at 1351–54, a preference reflecting how Commerce selects mandatory respondents, *id.* at 1353. Here, Commerce chose the exporters whose quantity-and-value questionnaires indicated that they were the largest exporters by volume, as expressly authorized by 19 U.S.C. § 1677f-1(c)(2) (2010).[5] *Albemarle* explains: "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." 821 F.3d at 1353. "The statute assumes that, absent [evidence that the largest exporters are not representative], reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." *Id.* "[T]he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents." *Id.* (quoting *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 1373–74 (Ct. Int'l Trade 1991)). And, recognizing that the presumption of representativeness may be overcome, *Albemarle* holds that, in order to depart from the expected method, "Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Id.*

Pointing to *Albermarle*'s observation that the mandatory respondents in that case accounted for "a majority of the market," *id.* at 1353, Commerce argues that *Albemarle*'s requirement of a showing of unrepresentativeness for departing from the expected method does not apply

---

[5]   The section was amended in 2012, but the relevant language is unchanged. 19 U.S.C. § 1677f-1(c)(2).

where the mandatory respondents do not account for "a majority of the market." Appellee's Br. 22. But that argument takes too narrow a view of *Albemarle*. The court did not rely for its statutory analysis on the observation that the particular respondents accounted for a "majority of the market." It relied on the statutory standards for selecting mandatory respondents under § 1677f-1(c)(2), which, the court held, make the mandatory respondents representative unless evidence shows otherwise. *Albemarle*, 821 F.3d at 1353. The statutory standards—involving either a statistical sample, 19 U.S.C. § 1677f-1(c)(2)(A), or the largest exporters by volume, *id.* § 1677f-1(c)(2)(B)—are not tied to a "majority" share of a "market," of the imports at issue, or any other class or collection.

Thus, the mandatory respondents in this matter are assumed to be representative. Under *Albemarle*, Commerce could not deviate from the expected method unless it found, based on substantial evidence, that the separate-rate firms' dumping is different from that of the mandatory respondents. But it has not done so.

Commerce did articulate a reason addressing firms that did *not* respond to the quantity-and-value questionnaires: it said that those firms likely "would have cooperated with the Department's investigation if they could have obtained a low rate." J.A. 102119. But that rationale does not suggest the needed inference about the separate-rate firms, all of which did respond to the questionnaires. Indeed, under Commerce's reasoning, the separate-rate firms' decisions to respond to the questionnaires might suggest that they are more similar to other firms, like the mandatory respondents, that responded. And Commerce may have suggested the same when, in its first "final determination," it calculated the separate rate by averaging the rates of the two mandatory respondents that had margins above *de minimis*. Multilayered Wood Flooring from the People's Republic of China: Final De-

termination of Sales at Less Than Fair Value, 76 Fed. Reg. at 64,322.

## III

Because Commerce has not made the findings necessary to justify departing from the "expected method" here, we vacate the judgment of the Court of International Trade, and we remand with instructions to remand to Commerce for it to reconsider its separate-rate determination. We find it unnecessary to address appellants' other challenges to the separate-rate determination.

Costs awarded to appellants.

**VACATED AND REMANDED**