# United States Court of Appeals for the Federal Circuit

---

**CHANGZHOU HAWD FLOORING CO., LTD.,
DUNHUA CITY DEXIN WOOD INDUSTRY CO.,
LTD., DALIAN HUILONG WOODEN PRODUCTS
CO., LTD., KUNSHAN YINGYI-NATURE WOOD
INDUSTRY CO., LTD., KARLY WOOD PRODUCT
LIMITED,**
*Plaintiffs-Appellants*

**DUNHUA CITY JISEN WOOD INDUSTRY CO.,
LTD., FINE FURNITURE (SHANGHAI) LIMITED,
ARMSTRONG WOOD PRODUCTS (KUNSHAN) CO.,
LTD.**
*Plaintiffs-Cross-Appellees*

**LUMBER LIQUIDATORS SERVICES, LLC, HOME
LEGEND, LLC**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**COALITION FOR AMERICAN HARDWOOD
PARITY,**
*Defendant-Cross-Appellant*

---

2018-2335, 2018-2337

---

Appeals from the United States Court of International Trade in No. 1:12-cv-00020-LMG, Senior Judge Leo M. Gordon.

————————————

Decided:  January 10, 2020

————————————

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, argued for plaintiffs-appellants and for plaintiff-cross-appellee Dunhua City Jisen Wood Industry Co., Ltd.  Also represented by JAMES KEVIN HORGAN, ALEXANDRA H. SALZMAN.

JILL CRAMER, Mowry & Grimson, PLLC, Washington, DC, argued for plaintiff-cross-appellee Fine Furniture (Shanghai) Limited.  Also represented by KRISTIN HEIM MOWRY, BRYAN CENKO, JEFFREY S. GRIMSON, SARAH M. WYSS, JAMES BEATY.

HAROLD DEEN KAPLAN, Hogan Lovells US LLP, Washington, DC, for plaintiff-cross-appellee Armstrong Wood Products (Kunshan) Co., Ltd.  Also represented by CRAIG A. LEWIS.

CLAUDIA BURKE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by JOSEPH H. HUNT, JEANNE DAVIDSON; MERCEDES MORNO, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, argued for defendant-cross-appellant.  Also represented by STEPHANIE MANAKER BELL, TESSA V. CAPELOTO, JEFFREY OWEN FRANK, MAUREEN E. THORSON.

————————————

Before MOORE, TARANTO, and CHEN, *Circuit Judges.*

TARANTO, *Circuit Judge.*

These appeals involve the United States Department of Commerce's investigation, under 19 U.S.C. §§ 1673−1673h, of dumping into the United States of multilayered wood flooring from the People's Republic of China (the "subject merchandise" or "merchandise"). The investigation was before us in *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017) (*Changzhou CAFC 2017*). Commerce individually investigated the dumping margins of three firms—the largest exporters of the subject merchandise by volume. *Id.* at 1009. Commerce also identified what the parties have called "separate-rate firms"—Chinese exporters and producers whose dumping margins Commerce did not individually investigate but that Commerce found to be independent from the government of China (a nonmarket economy) and so should be assigned an antidumping-duty rate separate from the "China-wide rate" ultimately assigned to firms lacking such independence. *Id.* Two subsets of such (non-individually investigated) separate-rate firms are before us: appellants, which did not even ask Commerce for individual review of their dumping margins; and cross-appellees ("voluntary-review firms"), which asked Commerce for such review but were denied. Before us are questions about Commerce's ultimate treatment of those two subsets of separate-rate firms.

Commerce eventually found dumping and issued an antidumping duty order for the merchandise under 19 U.S.C. §§ 1673d(c)(2), 1673e. It is undisputed that Commerce properly decided not to terminate the investigation, but instead to issue an order, upon finding a non-*de minimis* positive dumping margin for the exporters and producers that were part of the China-wide entity, even though Commerce also found, ultimately, that all three

individually investigated firms had zero dumping margins and freed those firms from further obligations relating to the order. It is also undisputed before us that Commerce properly applied the zero rate for the three individually investigated firms to the non-individually investigated separate-rate firms.

What is disputed is Commerce's decision not to free the non-individually investigated separate-rate firms from all obligations accompanying issuance of the order. Specifically, Commerce ruled that, although (because of the zero rate) such firms' merchandise initially would not be subject to cash deposits upon entry, the merchandise would remain subject to other obligations—notably, suspension of liquidation of entries, with the ultimate duty to be determined later, generally in an administrative review under 19 U.S.C. § 1675, in which such firms would have to participate and in which the duty might increase above the *de minimis* level, thereafter requiring cash deposits. The appeal and cross-appeal before us involve disputes about that ruling, which the parties have referred to as disputes about "including" these firms within "the order" (or keeping them "subject to" it) versus "excluding" them from it—terminology we will use.

When Commerce's ruling was challenged before the Court of International Trade (Trade Court), that court affirmed in part and reversed in part. It affirmed inclusion of appellants in the order, but it held that Commerce had not justified inclusion of the voluntary-review firms in the order. *Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317, 1321 (Ct. Int'l Trade 2018) (*Changzhou CIT 2018*). Appellants challenge the first of those holdings, while a domestic industry coalition (cross-appellant) challenges the second of those holdings (which cross-appellees defend). We affirm the judgment of the Trade Court.

I

In *Changzhou CAFC 2017*, we ordered a remand for Commerce to reconsider whether there was an adequate reason for assigning the non-individually investigated separate-rate firms a rate different from the zero rate Commerce had assigned to the individually investigated firms. 848 F.3d at 1012–13. Acting pursuant to our remand, Commerce determined that there was no such reason and therefore assigned a zero rate to the non-individually investigated separate-rate firms. *Final Results of Redetermination Pursuant to Court Order*, at 8 (issued Feb. 15, 2017) (Redetermination); J.A. 453. That determination is not challenged now. But Commerce also ruled that those firms should be kept subject to, not excluded from, the order. Redetermination at 10–14, 19–27; J.A. 455–59, 464–72. That ruling is now before us.

In support of the no-exclusion ruling, Commerce reasoned "that there is generally a key distinction in the statutory scheme between" two groups of producers and exporters: those "who have been individually investigated and which receive individual weighted average dumping margins that are zero or *de minimis*"; and those "who have not been individually investigated, and are, therefore, subject to the all others rate, which is based upon the individual weighted-average dumping margins which are zero or *de minimis*." Redetermination at 11; J.A. 456. Commerce also relied on a regulation, adopted to implement the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), that says that Commerce "will exclude from an affirmative final determination . . . any exporter or producer for which [Commerce] determines an *individual* weighted-average dumping margin . . . of zero or *de minimis*." 19 C.F.R. § 351.204(e)(1) (emphasis added); *see* Redetermination at 12–13; J.A. 457–58 (also relying on Commerce's explanations in promulgating the regulation in 1996−1997). Commerce further stated its policy judgment supporting its position: "policy considerations weigh

in favor of treating exclusion as an extraordinary measure, and one that should only be available in limited circumstances to companies that have been subject to individual investigation and all that entails (*i.e.*, providing full and complete questionnaire responses, cooperating with the Department, subject to verification, etc.)." Redetermination at 25; J.A. 470. Finally, while noting that firms can ask to be individually investigated as voluntary respondents, Redetermination at 13; J.A. 458, Commerce declared, without further policy explanation, that its position—"that companies that have not been individually examined are not eligible for exclusion" from an order—applies even to a firm that "requested to be a voluntary respondent" and supplied "full questionnaire responses" in the investigation, Redetermination at 24, 16; J.A. 469, 461.

The Trade Court reviewed Commerce's ruling in cases properly brought to it under 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c). The court generally upheld Commerce's decision to keep subject to the antidumping order those separate-rate firms with a zero rate that were not individually investigated. *Changzhou CIT 2018*, 324 F. Supp. 3d at 1321. The Trade Court concluded that the statutory scheme does not unambiguously resolve this exclusion issue and that Commerce's policy requiring individual examination before exclusion was generally reasonable and was not at odds with the statutory framework. *Id.* at 1325–26. But the Trade Court drew a different conclusion as to one subset of separate-rate firms with a zero rate: the voluntary-review firms. The court concluded that Commerce had not adequately justified keeping under the order a zero-rate firm that had supplied full questionnaire responses and sought, but was denied, the opportunity to provide evidence that it was not engaged in dumping. *Id.* at 1326–27. On that basis, the Trade Court reversed the denial of exclusion as to voluntary-review firms before it. *Id.*

Appellants appeal the Trade Court's upholding of their continuing inclusion in the antidumping duty order. Cross-appellant Coalition for American Hardwood Parity cross-appeals the Trade Court's judgment requiring exclusion of the voluntary-review firms on the present record. Commerce has not taken a position on the voluntary-review-firm issue raised by the Coalition's cross-appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

"We review Commerce's decision using the same standard of review applied by the Court of International Trade." *Nucor Corp. v. United States*, 927 F.3d 1243, 1248 (Fed. Cir. 2019). "Commerce's determination will be sustained unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1377 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

We determine whether Commerce's ruling is "in accordance with law" under the statute by applying the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If Congress has unambiguously answered the question before the court, the congressional answer controls. *See id.* at 842–43. But if Congress has not thus answered the question, the court must consider "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The Supreme Court has stated that, in applying *Chevron*, "the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). If, as in this case, ambiguity of the statute on the specific issue means that Congress made an "implicit rather than explicit" delegation of authority to

resolve the issue, the agency's interpretation governs if it is a "reasonable interpretation." *Chevron*, 467 U.S. at 844; *see Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 315, 321 (2014). "Related principles govern the interpretation of regulations by an agency." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414−18 (2019)).

We first summarize relevant aspects of the statutory and regulatory framework within which the questions before us arise. We then address appellants' argument for exclusion of all separate-rate firms assigned a zero rate, including those not individually investigated by Commerce. We finally address the specific situation of the voluntary-review cross-appellees.

A

On an interested party's petition, or on its own initiative, Commerce may launch an antidumping duty investigation into imports of a particular class of merchandise from a particular country of origin ("subject merchandise"). 19 U.S.C. § 1673a; *id.* § 1677(25) (defining "subject merchandise"). If it does so, Commerce first performs a preliminary investigation to determine whether there is a "reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold, at less than fair value." *Id.* § 1673b(b)(1)(A). If Commerce makes an affirmative preliminary determination, it is to order U.S. Customs and Border Protection (Customs) to require a cash deposit, bond, or other security for each importer's entry of subject merchandise as of specified dates and, in addition, to suspend liquidation of the subject merchandise. *Id.* §§ 1673b(d)(1), (2). Suspension of liquidation is the postponement of "the final computation or ascertainment of duties on entries." 19 C.F.R. § 159.1 (defining "liquidation"); *id.* § 351.102(a)(50).

After an affirmative preliminary determination, Commerce is to receive and investigate information on the way to making a final determination of "whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673d(a).[1] When making its final dumping determination, the statute instructs Commerce to "disregard any weighted average dumping margin that is *de minimis*." *Id.* § 1673d(a)(4). Section 1677(35)(B) defines "weighted average dumping margin" as "the percentage determined by dividing the aggregate dumping margins determined for *a specific exporter or producer* by the aggregate export prices and constructed export prices of such exporter or producer." *Id.* § 1677(35)(B) (emphasis added). The Statement of Administrative Action (SAA)—which Congress declared "an authoritative expression by the United States concerning the interpretation and application" of certain statutory provisions of relevance here, 19 U.S.C. § 3512(d)—adds that "[e]xporters or producers with *de minimis* [weighted average dumping] margins will be excluded from any affirmative determination." H.R. Doc. No. 103-316, vol. 1, at 844 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4179.

If Commerce makes an affirmative dumping determination under § 1673d(a), then for investigations of imports from a market economy the statute generally directs Commerce to "(I) determine the estimated weighted average dumping margin for each exporter or producer *individually investigated*, and (II) determine . . . the estimated *all-others* rate for all exporters and producers not individually investigated." 19 U.S.C. § 1673d(c)(1)(B)(i) (emphasis

---

[1] The statute also directs the International Trade Commission to make certain determinations, preliminary and final, about past or future injury to the pertinent domestic industry. 19 U.S.C. §§ 1673b(a), 1673d(b). Those determinations are not relevant to the issues before us.

added); *see id.* § 1677f-1(c)(1) (general rule requiring Commerce to determine "the individual weighted average dumping margin for each known exporter and producer of the subject merchandise"). But for purposes of determining "dumping margins" under § 1673d(c), if the number of exporters or producers is so "large" that it is "not practicable" for Commerce to examine each one individually, Commerce may limit its examination to (1) a statistically valid sample of exporters, producers, or types of products or (2) exporters and producers accounting for the largest volume of subject merchandise from the exporting country that can be reasonably examined. *Id.* § 1677f-1(c)(2). If Commerce chooses that route, it then must use the information about the "exporters and producers individually investigated" to determine the "all-others rate" dumping margin. *Id.* § 1673d(c)(5*); see id.* § 1677f-1(c)(2). Commerce must determine the all-others rate by either weight-averaging the non-*de minimis* margins for the individually investigated firms—excluding margins determined under § 1677e (addressing cases of certain information or process deficiencies)—or by "any reasonable method" (with the "expected method" being weight-averaging) where all such firms have zero or de minimis margins. *Id.* § 1673d(c)(5); *see* SAA at 873, 1994 U.S.C.C.A.N. at 4201; *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1351–52 (Fed. Cir. 2016).

For investigations involving a nonmarket-economy country, the statute is silent regarding how to determine the comparable "separate rate" for firms that are not individually investigated but have established their independence from that country's government. *Yangzhou Bestpak*, 716 F.3d at 1374, 1377–78. But Commerce generally uses the same methodology to determine a separate rate for non-individually investigated firms in nonmarket-economy cases as it employs to determine the all-others rate in market-economy cases, and we have found that approach

acceptable. *See Changzhou CAFC 2017*, 848 F.3d at 1011; *Albemarle*, 821 F.3d at 1348, 1351–53; *Yangzhou Bestpak*, 716 F.3d at 1374, 1377–78. Commerce followed that approach here.

Upon making the affirmative determination of dumping and determining the margin for individually investigated firms and the separate rate for others, Commerce must order "the posting of a cash deposit, bond, or other security," based on those figures, "for each entry of the subject merchandise." 19 U.S.C. § 1673d(c)(1)(B)(ii). Commerce must also order the "suspension of liquidation under section 1673b(d)(2)"—the cited provision requiring such suspension as to "all entries of merchandise subject to the determination" after certain dates, *id.* § 1673b(d)(2)—if there was not already such a suspension at the preliminary-determination stage. *Id.* § 1673d(c)(1)(C). Commerce "will exclude from an affirmative final determination . . . any exporter or producer for which the Secretary determines an individual weighted-average dumping margin . . . of zero or *de minimis*." 19 C.F.R. § 351.204(e)(1). If the International Trade Commission also makes an affirmative final determination regarding material injury to domestic producers, Commerce then must issue an "antidumping duty order under section 1673e(a)." 19 U.S.C. § 1673d(c)(2); *see* 19 C.F.R. § 351.211.

The antidumping duty order "directs customs officers to assess an antidumping duty equal to the amount" of the dumping margin within a certain period, "includes a description of the subject merchandise," and requires importers to "deposit [the] estimated antidumping duties pending liquidation of entries of merchandise." 19 U.S.C. § 1673e(a); 19 C.F.R. § 351.211(b). Upon receipt of an antidumping duty order, Customs suspends liquidation of entries of subject merchandise and informs the importer of the estimated duty to be paid based on Commerce's dumping margin determination. 19 C.F.R. § 159.58. An

importer becomes liable for any antidumping duty as soon as the foreign merchandise arrives in the United States, though Commerce will assess the final value of duties owed at a later time. *See* 19 U.S.C. § 1675(a)(2)(C); 19 C.F.R. §§ 141.1(a), 351.212(a). In addition to making deposits for the estimated antidumping duty, the importer of "merchandise subject to an antidumping duty order" must comply with certain obligations, including the obligation to provide Customs with such information as Commerce deems necessary for determining the export price of the merchandise and ascertaining the amount of an antidumping duty and the obligation to maintain records concerning the sale of the merchandise. 19 U.S.C. § 1673g(b).

An exporter or producer named in an antidumping duty order is subject to annual administrative reviews, if initiated, whose purpose is to "determine . . . the amount of any antidumping duty" owed on the subject merchandise for the period of review. *Id.* § 1675(a)(1); 19 C.F.R. § 351.213. The results of the annual review dictate an importer's final antidumping duty liability for the period of review. 19 U.S.C. § 1675(a)(2)(C) (the determination forms "the basis for the assessment of . . . antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties."). If no review is requested or conducted, Commerce is to instruct Customs to apply the rate applied in the previous period of review when assessing duties owed on subject merchandise. 19 C.F.R. § 351.212(c). After completing an annual review, Commerce is to instruct Customs to liquidate entries pursuant to the determined rate, and Customs must liquidate entries "promptly." 19 U.S.C. § 1675(a)(3)(B). An antidumping duty order also subjects the named firms to five-year "sunset" reviews to determine whether the antidumping duty order should persist. *Id.* § 1675(c). Interested parties to the five-year review must provide information requested by Commerce. *Id.* § 1675(c)(2).

B

The statute provides no unambiguous answer to the question whether non-individually investigated separate-rate firms in a nonmarket economy that are assigned a zero rate (based on the zero rates of the individually investigated firms) should be excluded from an antidumping duty order issued because of non-*de minimis* positive dumping margins of the country-wide entity. And Commerce's answer to the question is a permissible, reasonable one, consistent with the statute and relevant regulations.

1

As an initial matter, appellants contend that Commerce has forfeited any ability to object to their exclusion from the antidumping duty order by not timely raising it earlier. Appellants rest that contention on the fact that, in *Changzhou CAFC 2017*, when the appellants there suggested that they would be entitled to exclusion from the order *if* they received a zero rate, Commerce did not register disagreement. *See Changzhou CAFC 2017*, 848 F.3d at 1010−11. We reject appellants' forfeiture contention.

The only question to which exclusion from the order was even arguably pertinent in the 2017 appeal was whether the appellants had a stake in challenging the above-*de minimis* rate that they had been assigned—a rate that undisputedly kept the appellants under the order—so that our decision on the rate challenge would not be advisory. We noted that "Commerce does not disagree that appellants have a stake in challenging the above-*de minimis* rate." *Id.* at 1011. But for the appellants to have such a stake, it was sufficient that obtaining a zero rate held a genuine possibility of some relief, and that possibility existed at least because reduction in burdens under the order or even exclusion from the order, if the appellants eventually received a zero rate, had not been foreclosed. Until the appellants did receive a zero rate on remand, Commerce

had no need to decide, and did not decide, whether they would be excluded if they received a zero rate. Accordingly, Commerce forfeited nothing by failing then to take a position on the issue presented now.[2]

2

Conducting the step-one inquiry required by *Chevron*, we conclude that nothing in the statute unambiguously provides that all separate-rate firms, including those not individually investigated, must be excluded from all obligations under an antidumping duty order when they are assigned a zero rate based on zero or *de minimis* dumping margins of individually investigated firms. Appellants rely for their view principally on the instruction of § 1673d(a)(4) to Commerce to "disregard any weighted average dumping margin that is *de minimis*." But that provision is not the clear prescription that appellants say it is.

Section 1677(35)(B) defines "weighted average dumping margin" as "the percent determined by dividing the aggregate dumping margins determined *for a specific exporter or producer* by the aggregate export prices and constructed export prices *of such exporter or producer*" (emphases added). That language can easily be read to refer only to a dumping margin determined for an individually

---

[2]    Appellants also invoke exhaustion principles, which, where they apply, protect an agency (and potentially agency-supporting parties) against litigants pressing positions on appeal that they did not adequately present before the agency. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013). The issue of exclusion in this case was presented before Commerce, and all parties had the opportunity to argue their positions there.

investigated exporter or producer, not to margins attributed derivatively under a legal rule for setting a rate for a class of others, like the "all-others rate" for market economies and its "separate-rate" counterpart for nonmarket economies. The Statement of Administrative Action is consistent with that reading when it observes that "[e]xporters or producers with *de minimis* [weighted average dumping] margins will be excluded from any affirmative determination." SAA at 844, 1994 U.S.C.C.A.N. at 4179. A calculated "separate rate" is not itself a "weighted average dumping margin" under the statutory definition; it is not determined by the dumping margins or export prices for the "specific exporter or producer" to which that rate is applied. Even if we assume that it is clear that individually reviewed firms with *de minimis* dumping margins must be excluded from all obligations under an antidumping duty order, the statute does not speak with any clarity to conferring the same benefit on non-individually reviewed firms assigned a *de minimis* dumping margin or zero rate.

Another provision of the statutory scheme is informative for its contrast with § 1673d. In § 1673h(b)(3), Congress specifically addressed excluding firms that were reviewed in the aggregate from an antidumping duty order issued for "short life cycle merchandise." Under the heading "Exclusion," the provision states that "[s]hort life cycle merchandise of a manufacturer shall not be treated as being the subject of an affirmative dumping determination if—(i) such merchandise of the manufacturer is part of a group of merchandise to which [Commerce] assigns (in lieu of making separate determinations . . . ) an amount determined" by comparing the normal value and export price of the group of merchandise, as long as the specific manufacturer and its merchandise are not named in the affirmative dumping determination or any subsequent order. 19

U.S.C. § 1673h(b)(3)(B). There is no comparable language applicable to the circumstances present here.

Appellants also cannot find adequate support for a favorable conclusion under *Chevron* step one in the sampling provisions of §§ 1677f-1 and 1673d(c)(5). As described *supra*, those provisions authorize Commerce to use a subset of individually investigated exporters or producers, duly selected, as representative for purposes of assigning a "dumping margin" or "rate" to firms not individually investigated. *See Changzhou CAFC 2017*, 848 F.3d at 1012; *Albemarle*, 821 F.3d at 1353. But the provisions by their terms go no farther than prescribing a method for the determination of the margins and rates to be used in an order. They do not unambiguously require that any firm not individually investigated be treated the same as individually investigated firms for all purposes—specifically, for the purpose of excluding their merchandise from all obligations under an order that eventually issues.

3

Putting to one side the voluntary-review firms discussed *infra*, we conclude, at step two of *Chevron*, that Commerce's position on non-individually investigated separate-rate firms is a reasonable interpretation of the statute. That position reflects a reasonable policy judgment and is supported by Commerce's formal regulations.

According to Commerce, exclusion from an order should be treated "as an extraordinary measure, and one that should only be available in limited circumstances to companies that have been subject to individual investigation and all that entails (*i.e.*, providing full and complete questionnaire responses, cooperating with [Commerce], subject to verification, etc.)." Redetermination at 25; J.A. 470; *see* Redetermination at 13; J.A. 458. When there is no individual investigation of a firm, there is no thorough scrutiny and verification of firm-specific information, as

there is for individually investigated firms. *See AMS Associates, Inc. v. United States*, 719 F.3d 1376, 1380 (Fed. Cir. 2013) (discussing verification provisions). Commerce can thus reasonably conclude that it has insufficient knowledge to make confident predictions about the actual behavior of that firm, compared to a firm that has gone through an individual investigation. The assignment of a zero rate does not contradict that common-sense disparity or imply an across-the-board equating of agency knowledge about individually investigated and non-individually investigated firms. It occurs for more limited reasons, namely, it would be administratively impractical for Commerce to investigate all firms, a rate must be assigned to all others, and for *that* purpose the individually investigated firms are presumptively representative. *Changzhou CAFC 2017*, 848 F.3d at 1012; *Albermarle*, 821 F.3d at 1353. We do not say that Commerce could not reasonably make a different choice, but it is on its face reasonable for Commerce to decide to keep the uninvestigated firms subject to the obligations that accompany inclusion in an order—obligations that allow for continued receipt by Commerce of information used in later annual reviews that determine actual dumping margins for calculating duties owed.

Commerce's regulations and their history reflect this judgment. In 19 C.F.R. § 351.204(e)(1), Commerce has provided that it will exclude from an affirmative final determination—by which the parties understand it to mean exclude from continuing obligations of an order—"any exporter or producer for which the Secretary determines an *individual* weighted-average dumping margin . . . of zero or *de minimis*." (emphasis added). When proposing this regulation, Commerce stated that the regulation would apply to "any exporter or producer that is *individually* examined and that receives an *individual* weighted-average dumping margin . . . rate of zero or *de minimis*." *Antidumping Duties; Countervailing Duties: Notice of proposed*

*rulemaking and request for Public Comments*, 61 Fed. Reg. 7,308, 7,315 (Dep't of Commerce Feb. 27, 1996) (emphases added). When adopting the regulation, Commerce added that "decisions on exclusions will be based on a firm's actual behavior, as opposed to assertions regarding its possible future behavior." *Antidumping Duties; Countervailing Duties: Final rule*, 62 Fed. Reg. 27,296, 27,311 (Dep't of Commerce May 19, 1997). The focus on "individual" examination and a "firm's actual behavior" distinguishes firms in appellants' position, for which there is only a decision of a provisional entitlement (zero rate) based on considerations that do not imply a justification for exclusion from all obligations of an order.

Appellants suggest that there is a substantial contrary past practice by Commerce, but that suggestion lacks merit. Nearly all the prior decisions cited by appellants involved market economies and/or countervailing duty determinations. *E.g.*, *Steel Concrete Reinforcing Bar From Turkey: Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 79 Fed. Reg. 54,965 (Dep't Commerce, Sept. 15, 2014); *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From Taiwan: Final Negative Countervailing Duty Determination*, 81 Fed. Reg. 35,299 (Dept. Commerce, June 2, 2016). Those situations are materially different from the one presented here.

In nonmarket-economy investigations like this one, when Commerce makes an affirmative determination that the country-wide entity has engaged in dumping, there is a rebuttable presumption that each exporter or producer is state-controlled and therefore covered by a single state-wide dumping margin. 19 C.F.R. § 351.107(d); *see Changzhou CAFC 2017*, 848 F.3d at 1009. Commerce, in that case, issues an antidumping duty order even if the individually reviewed and separate-rate firms receive *de minimis* dumping margins. *See* 19 U.S.C. §§ 1673d(c)(1), (2). By

contrast, in market-economy and countervailing-duty investigations, there is no presumption of a state-wide entity. In those matters, when all individually reviewed firms receive a *de minimis* dumping margin or countervailable subsidy, Commerce lacks the authority to issue an antidumping or countervailing duty order in the first instance. *See id.* §§ 1671d(a)(3), (c)(2); *id.* §§ 1673d(a)(4), (c)(2). The great bulk of past Commerce decisions relied on by appellants thus do not involve an issued order with a zero rate for a non-individually investigated exporter or producer.

Appellants cite three nonmarket-economy antidumping-duty decisions by Commerce that, they allege, involved exclusion of non-individually reviewed firms with *de minimis* dumping margins. Two of the decisions do not help appellants because there was no positive non-*de minimis* dumping found. In one, every known exporter or producer was individually examined and received a *de minimis* dumping margin rate. *Notice of Final Determination of Sales at Not Less Than Fair Value: Pure Magnesium from the Russian Federation*, 66 Fed. Reg 49,347, 49,348–49 (Sept. 27, 2001). In the other, as appellants recognize, Commerce had not yet implemented its China-wide-rate policy. *Antidumping Duty Orders and Amendments to Final Determinations of Sales at Less Than Fair Value: Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed. Reg. 64,240, 64,240–41 (Dec. 9, 1991); Appellants' Br. 42. When all mandatory respondents received a *de minimis* rate, Commerce made a negative dumping determination and the antidumping duty order was revoked. *Oscillating and Ceiling Fans from the People's Republic of China: Notice of Court Decision and Revocation of Antidumping Duty Order on Oscillating Fans*, 58 Fed. Reg. 6,474, 6,474 (Jan. 29, 1993).

Only one previous Commerce decision offers appellants some support, but the support is weak and not enough to

make Commerce's current position unreasonable.  In *Certain Automotive Replacement Glass Windshields from the People's Republic of China*, the mandatory respondents and the separate-rate firms each received a *de minimis* dumping margin, and *both* groups were in fact excluded from the antidumping duty order, despite evidence of dumping by the China-wide firm.  *Certain Automotive Replacement Glass Windshields from the People's Republic of China: Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order Pursuant to Court Decision*, 72 Fed. Reg. 70,294, 70,294–95 (Dec. 11, 2007); *see* J.A. 541–49.  Commerce's exclusion order, however, gives no statutory analysis or other explanation for excluding the separate-rate firms from the antidumping duty order.  *See id.*  Further, as appellants recognize, the excluded separate-rate firms in that investigation had previously been mandatory respondents in an annual review where each had been individually examined and received a *de minimis* dumping margin.  *Automotive Replacement Glass Windshields from the People's Republic of China: Final Results of Administrative Review*, 70 Fed. Reg. 54,355, 54,357 (Sept. 14, 2005); Appellants' Br. 40.  In these circumstances, we see no basis for disagreeing with the Trade Court that Commerce reasonably included appellants in the antidumping duty order.[3]

---

[3]      We do not rely on certain decisions, cited to us by Commerce, that predate the adoption and implementation of the Uruguay Round Agreements Act.  *See Certain Small Business Telephone Systems and Subassemblies Thereof from Taiwan*, 54 Fed. Reg. 42,543 (Oct. 17, 1989); *Auto Telecom Co. v. United States*, 765 F. Supp. 1094, 1096–98 (Ct. Int'l Trade 1991), *aff'd*, *Bitronic Telecoms Co. v. United States*, 954 F.2d 733 (Table) (Fed. Cir. 1992).

C

The Trade Court concluded that Commerce had not adequately supported its decision to include the voluntary-review firms in the antidumping duty order and therefore reversed Commerce's inclusion of such firms. *Changzhou CIT 2018*, 324 F. Supp. 3d at 1326–27. Cross-appellant appeals only the Trade Court's conclusion that Commerce had not adequately supported its inclusion of such firms in the order. Cross-appellant presents no argument challenging the Trade Court's remedy of reversal, rather than remand, if the Trade Court was correct about the lack of adequate support on the merits. We therefore address only the merits. We affirm the Trade Court.

To the extent that cross-appellant argues that the statute unambiguously requires inclusion of the voluntary-review firms, we see no support for that position. Cross-appellant points to no statutory provision not already discussed with respect to the main issue on appeal, concerning separate-rate firms generally. The statute's provisions provide no clearer direction for treatment of voluntary-review firms than for separate-rate firms overall.

To the extent that cross-appellant argues that Commerce did give a reasonable justification for its action regarding the voluntary-review firms, we reject that argument. The Trade Court explained at least one substantial consideration that weighs in favor of excluding a firm that volunteers for individual review and provides extensive information aimed at enabling such review. Such efforts in volunteering for investigation offer some reason to think that for those firms, unlike for non-volunteer firms, there is no more need for continuing coverage than there is for individually investigated firms found to have a *de minimis* dumping margin. *Changzhou CIT 2018*, 324 F. Supp. 3d at 1326–27. But as Commerce acknowledged at oral argument, Oral Argument 19:57–20:05, Commerce, in

its ruling, provided no answer to this point or countervailing reasons that might outweigh it. *See* Redetermination at 24−25; J.A. 469−70. Indeed, Commerce has not defended this aspect of its ruling in this court. We see no reversible error in the Trade Court's conclusion that Commerce did not provide an adequate justification for including the voluntary-review firms in the antidumping duty order in this case. *See Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1376−79 (Fed. Cir. 2012) (setting aside Commerce order where not adequately justified).

We therefore reject cross-appellant's statutory and reasonableness challenges to the Trade Court's judgment on this point. We have already noted one limit on our decision to affirm the Trade Court regarding the voluntary-review firms: we say nothing about that court's reversal of Commerce rather than remand for further explanation. We here note another limit on our decision. We understand the Trade Court decision as not going beyond holding that Commerce has not in this proceeding provided a sufficient rationale for continuing to include the voluntary-review firms in the order, and we rely on that understanding in affirming the Trade Court's judgment. It remains open to Commerce in the future, should the issue arise, to address this issue more fully than it has done in this investigation. We do not prejudge the reasonableness of any justification Commerce might yet articulate for deciding to include voluntary-review firms in an antidumping-duty order.

IV

For the foregoing reasons, we affirm the judgment of the Trade Court.

The parties shall bear their own costs.

**AFFIRMED**